**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————— )
LANCE L. ANNICELLI )
1685 Spinfisher Drive )
Apopka, Florida 32712 )
                              )     CASE NO. _____
         v. )
                              )
HON. BARBARA M. BARRETT )
Secretary of the Air Force )
1670 Air Force Pentagon )
Washington, DC 20330-1670 )
———————————————————— )

## COMPLAINT

**(APA Review of Final Decision of the Air Force Board for Correction of Military Records)**

### JURISDICTION AND VENUE

1.      This action seeks review of the final decision of the Air Force Board for Correction of Military Records (AFBCMR), dated May 30, 2019, denying Plaintiff's application to correct his Air Force records. The AFBCMR's decision is final agency decision under the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*

2.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, federal question jurisdiction. Plaintiff raises claims under federal statutes and Department of the Air Force regulations.

3.      The Act of Congress upon which federal question jurisdiction rests is 10 U.S.C. § 1552 which authorizes and governs the AFBCMR. Under the APA, the Court may set aside decisions of the AFBCMR that are arbitrary, capricious, unsupported by substantial evidence, or otherwise contrary to law or mandatory procedure.

4.      This Court has personal jurisdiction over the parties pursuant to 5 U.S.C. § 702.

5.      Venue in this Court is proper under 5 U.S.C. § 703 and 28 U.S.C. § 1391 *et seq*.

## THE PARTIES

6.      Plaintiff, Lance Annicelli, a United States citizen, is a retired Air Force lieutenant colonel. He resides at the address provided in the caption above.

7.      Defendant, the Honorable Barbara M. Barrett, is the Secretary of the Air Force. She is the head of the Department of the Air Force. She resides at the address provided in the caption above. The AFBCMR acts on behalf of the Secretary of the Air Force.

## STATUTE OF LIMITATIONS AND
## EXHAUSTION OF ADMINISTRATIVE REMEDIES

8.      In September 2017, Plaintiff filed an application with the AFBCMR, requesting various records corrections.

9.      On May 30, 2019, the AFBCMR issued a final decision in which it denied Plaintiff's application.

10.      Plaintiff has exhausted his administrative remedies and this matter is ripe for judicial review.

11.      Pursuant to 28 U.S.C. § 2401(a), Plaintiff's claims must be made within six years of accrual.

12.      Plaintiff's clams accrued on May 30, 2019, when the AFBCMR issued its final decision.

13.      Plaintiff's claims are timely before this Court.

**FACTS**

14.     Plaintiff initially enlisted in the United States Air Force (USAF) directly out of high school in 1982. He achieved the rank of sergeant before being granted an honorable discharge to attend college.

15.     In January 1994, he received a direct commission as an ensign in the United States Navy Reserve before transferring to serve on active duty in the USAF in October 1994. He would remain on active duty in the USAF until his retirement on September 1, 2015.

16.     Throughout his 25-year career, Plaintiff held various leadership positions related to the Clinical Laboratory officer and Aerospace Physiologist Air Force Specialty Codes (AFSCs) he held.

17.     On June 26, 2014, Plaintiff assumed command of the 9th Physiological Support Squadron (9th PSPTS) located at Beale Air Force Base in California. At the time, the 9th PSPTS was a 110-member squadron responsible for high altitude physiological support for the Air Force's U-2 flight operations.

18.     Plaintiff's performance record before assuming command of the 9th PSPTS was superb.

19.     In the officer performance report (OPR) immediately preceding Plaintiff's assumption of command of the 9th PSPTS, Plaintiff's rater and additional rater stratified Plaintiff as the #1 officer amongst his peers and offered their full support for additional leadership positions.

20.     When he took command of the 9th PSPTS, Plaintiff's goal was to improve, among other things, the squadron's performance and morale, which had longstanding issues as evidenced by several climate assessment surveys and squadron members themselves. He immediately sought assistance from wing command to address morale and climate issues, to curtail manning losses, and to reintroduce standards and accountability to the squadron.

21.     On February 12, 2015, Plaintiff was informed that he was being "temporarily relieved" of command by 9th Medical Group Commander, Colonel Jody Ocker, pending a Commander-Directed Investigation (CDI) as she stepped out the door for a two-week vacation.

22.     As Plaintiff described in his AFBCMR application materials, he was called into Col Ocker's office and was not given any specific information other than being told that something "so egregious" had been brought to her attention that she was "temporarily" relieving Plaintiff of command, directing the CDI and ordering him to report to the 9th Reconnaissance Wing (9th RW) where he was to await her return from vacation and the conclusion of the CDI.

23.     The next day, when Plaintiff reported as directed to the 9th RW, the wing commander, Colonel Douglas Lee, told Plaintiff that although Col Ocker had requested a CDI, he was stepping in to remove Plaintiff from command.  Contrary to Col Ocker's assertion that Plaintiff had been "temporarily" relieved pending results of a fact-finding investigation, Col Lee told Plaintiff that he had made the decision to "permanently" remove Plaintiff from command before the CDI was even conducted and that the decision was his and his alone. According to Plaintiff, Col Lee refused to specify what the basis was for the "permanent" removal before the CDI process was even started, nor did he explain who had accused him or what were the specifics of the allegations.

24.     The CDI was then conducted from February 12, 2015 to February 27, 2015, although the investigating officer (IO) did not complete the report until March 6, 2015.

25.     During the CDI, Plaintiff was never interviewed by the IO, nor given the opportunity to respond to the actual evidence the IO had gathered during the investigation.

26.     After the close of the investigation period but before the report was completed, Plaintiff was permitted to submit an emailed response to the allegation of "toxic leadership." At the time,

Plaintiff had little more than the six questions the IO had posed to interviewees and the nonspecific allegation of "toxic leadership."

27.     In his response dated March 2, 2015, Plaintiff attempted to answer the interview questions from his perspective and provide evidence supporting his explanations. He also provided a detailed list of witnesses in accordance with the published CDI Guide that could factually attest to his leadership as well as provide insight into any specific issues with which Plaintiff was actively involved.

28.     On or about March 9, 2015, Col Ocker met with Plaintiff to discuss the findings of the CDI.

29.     When Plaintiff asked for a copy of the CDI report, Col Ocker refused to provide one and instead directed Plaintiff to request a copy through the Freedom of Information Act (FOIA). On the same day, Plaintiff submitted a FOIA request for all documents related to the CDI.

30.     On or about April 10, 2015, the Air Force partially released some responsive records, including a redacted CDI report, but withheld all of the witness statements upon which the CDI's findings were based.

31.     Plaintiff administratively appealed the Air Force's withholding of the CDI witness statements on April 14, 2015. The appeal was later denied on September 21, 2015.

32.     Plaintiff would not receive a copy of heavily redacted witness statements until August 2016 well after he had retired from the Air Force and only after asserting FOIA-related claims in the United States Court for the District of Columbia. *See Annicelli v. Dep't of the Air Force*, 16-CV-00547 (D.D.C. Mar. 22, 2016).

33.     On May 5, 2015, Plaintiff received an adverse "referral" OPR on May 5, 2015. Col Ocker, who was Plaintiff's rater for the OPR, commented that Plaintiff was "Relieved of

command; CDI substantiated toxic leadership; unhealthy org'l climate degraded unit effectiveness." Col Ocker also marked Plaintiff as "does not meet standards" for Leadership Skills in the performance factors section of the OPR.

34.     On or about May 11, 2015, Plaintiff a submitted an initial request for redress to Col Ocker under Uniform Code of Military Justice (UCMJ) Article 138 and Air Force Instruction (AFI) 51-904. He requested "reinstatement as the 9 Physiological Support Squadron Commander, or, in the alternative, to be allowed to retire as the 9 Physiological Support Squadron Commander, with credit as a graduated Commander, a non-referral OPR for [his] period of service at Beale AFB, and a retraction of the allegation of "toxic leadership" briefed to the 9 RW Group and Squadron Commanders."

35.     On May 15, 2015, Plaintiff submitted a substantially similar UCMJ Article 138 redress request to Col Lee.

36.     On May 21, 2015, Plaintiff rebutted the referral OPR arguing, among other things, that he was not provided written feedback in accordance with AFI 36-2406, that the comments lacked sufficient specificity to comply with the AFI, and that the OPR did not accurately reflect his performance as an officer and commander.

37.     Plaintiff's rebuttal also made various arguments that the CDI IO failed to provide a legally sufficient, objective investigation and report in accordance with the Air Force CDI Guide and therefore failed to provide his command with the ability to make a fair and objective decision regarding his leadership.

38.     On May 28, 2015, Col Ocker denied Plaintiff's Article 138 request. In her denial memo, Col Ocker cited thirty-three or thirty-four witness statements and appeared to base substantial portions of her rationale on the contents of the statements. At the time, Plaintiff did not possess

nor had he viewed any of the witness statements, nor was he provided any specifics about why he was removed from command.

39.     Col Ocker also maintained that although she had explicitly stated his removal from command was temporary pending the results of he CDI, she actually had meant for the relief to be permanent, claiming that "[t]he word 'temporary' was used because while you would never be able to effectively command the 9PSPTS, it was important to leave open the possibility that you might be able to command another unit if the currently existing statements were isolated incidents."  In his later AFBCMR application, Plaintiff would provide evidence that Col Ocker had always meant for the relief to be temporary but later equivocated in her Article 138 response to minimize the fact that Col Lee had involved himself in the matter and made Plaintiff's relief of command permanent.

40.     On June 1, 2015, Col Lee denied Plaintiff's Article 138 request with much of the same justification Col Ocker provided in her response.

41.     Col Lee admitted that he had told Plaintiff it was he who had permanently removed him from command but it was actually Col Ocker who had done so, with his support, and Col Lee was merely being "in-artful" about the exact removal process.

42.     On June 22, 2015, Plaintiff submitted a formal request for redress under UCMJ Article 138 to the General Court-Martial Authority (GCMA), requesting essentially the same relief as he had sought from Col Ocker and Col Lee with a further request to direct an additional investigation into the matter. The request included allegations of the wing commander's undue influence before the start of any investigation, false and misleading statements, the lack of adherence to the published CDI Guide and inappropriate use of statistics (e.g. making question

responses voluntary then misleadingly proffering that 6 of 6 out of 33 interviewees who chose to answer a certain question, and did so negatively, was "100%").

43.     Among other things, Plaintiff argued that he had yet to be informed of the specific allegations that triggered his removal from command, or of any incidents reflecting how or why he was failing to meet leadership standards.

44.     Plaintiff stated that he was denied the opportunity to view or hear all the allegations or evidence against him, including the actual witness statements.

45.     Plaintiff argued that the CDI was arbitrary, capricious, unfair, biased, lacked evidence, and was legally insufficient according to the CDI Guide and the CDI report was therefore legally insufficient.

46.     Plaintiff identified specific provisions of the CDI Guide which he argued the IO had violated and otherwise alleged that the report misused and misrepresented data and evidence acquired during the CDI and that it relied on opinion and hearsay, not fact based, in violation of the CDI Guide.

47.     Plaintiff also addressed the denial rationale provided by Col Ocker and Col Lee. Because he did not possess the actual witness statements Col Ocker cited in her denial memo, Plaintiff was left to speculate as to whom or what certain references in her denial pertained. Plaintiff nonetheless attempted to provide contrary evidence and explain that his actions did not constitute those of a "toxic leader," just the opposite, which is supported by factual evidence.

48.     On July 27, 2015, the GCMA denied Plaintiff's formal UCMJ Article 138 in a one-page, five paragraph memorandum. The memorandum broadly characterized the contents of Plaintiff's complaint materials and provided conclusory rationale as follows:

> I find that Col Ocker did not abuse her authority or act arbitrarily, capriciously, or unfairly in removing you as commander of the 9 PSPTS. Based upon my review of

the evidence, I find that Colonel Ocker acted reasonable in relieving you from
command based on her loss in confidence in your ability to command the unit.
Furthermore, I find that you were not wronged by Colonel Lee because you were
relieved from command by Colonel Ocker.

49.     The GCMA subsequently forwarded the action to the Air Force Office of the Judge

Advocate General (AF/JAA) in accordance with regulation.

50.     Meantime, Plaintiff's officially accepted subsequent assignment to Tyndall Air Force

Base was cancelled from under him.

51.     At some point during this time, Plaintiff received a "Do Not Promote" recommendation

on a Performance Recommendation Form (PRF) for the upcoming calendar year 2016 Colonel

promotion board.

52.     Plaintiff voluntarily retired effective September 1, 2015.

53.     On November 15, 2015, the Director of the Administrative Law Directorate at AF/JAA

sustained the GCMA's Article 138 complaint denial, stating as follows:

> By authority of the Secretary of the Air Force, I have reviewed all matters submitted
> by you in your request for redress filed under Article 138, Uniform Code of Military
> Justice (UCMJ), dated 22 June 2015. I have determined that the actions taken in
> this matter by the Commander, 9th Medical Group, and the Commander, 9th
> Reconnaissance Wing were appropriate. The denial of your request for redress is
> hereby sustained. . . . This constitutes final action of your Article 138, UCMJ,
> complaint.

**AFBCMR Application**

54.     On or about August 17, 2017, Plaintiff submitted an application to the AFBCMR.

55.     The application materials contained a legal memorandum authored by previous counsel

and a substantial amount of supporting documentation.

56.     The memorandum identified the following errors or injustices in Plaintiff's record:

an unjust and inaccurate OPR, with a close out date of 1 May 2015 . . . from 9th Reconnaissance

Wing, Beale AFB, CA; an AF Form 709, PRF for the Calendar Year P0615B Colonel Central

Selection Board, reflecting an overall promotion recommendation of "Do Not Promote"; and

records showing his release from active duty on August 31, 2015 and placement on the Air Force

retired list.

57.    Plaintiff requested the following relief:

1.  Expunge the 2015 OPR (closing out 1 May 2015) from all his Air Force records.

2.  Expunge the AF Form 709, PRF for the Calendar Year (CY) P0615B Colonel (Col) Central Selection Board (CSB) reflecting an overall promotion recommendation of "Do Not Promote" and replace it with a re-accomplished PRF reflecting an overall recommendation of "Definitely Promote."

3.  Submit his corrected record, to include the updated PRF reflecting an overall promotion recommendation of "Definitely Promote" to a SSB for the CYl6 Col IPZ CSB (P0616B) for the grade of Colonel and all additional impacted selection boards. And since his records had already been approved to meet the P0614B SSB . . . with a previous "Definitely Promote" prior to being relieved of command . . . that he be allowed to meet a SSB for that missed opportunity.

4.  Waive the requirement and approve permanent wear of the command insignia pin to reflect his completion of a successful command tour.

5.  Change his records to reflect that he did not separate or retire from active duty on 31 August 2015, but on that date he continued to serve on active duty and was ordered a permanent change of station (PCS) to his home of selection or home of record, pending further orders.

6.  In the alternative, reinstate him to active duty status with the Air Force in the grade of colonel with credit as a graduated squadron commander.

7.  Enter him into a Senior Developmental Education (SDE) in residence school since prior to his removal from command he had been an alternate select. . . .

8.  In the alternative, retire him in the grade of Colonel and waive the associated Active Duty Service Commitment (ADSC).

9.  Any other corrections or personnel actions that the AFBCMR deems appropriate and which would remove the negative impact of the 2015 OPR on his opportunity for advancement and promotion.

58.    Plaintiff's application contained evidence and arguments that previously had not been

presented to or considered by members of his command during the Article 138 proceedings.  For

example, it contained a statement from Lt Col Benjamin Christen who personally witnessed several of the key actions in the matter yet had not provided a statement during the Article 138 proceedings.  Lt Col Christen witnessed Col Ocker tell Lt Col Annicelli that he was being temporarily relieved of command pending an investigation upon which his return to command would be made.  Lt Col Christen further attested to the lack of specifics Col Ocker gave to Plaintiff regarding the basis for his "temporary" removal.  Lt Col Christen was also present when Col Lee informed Plaintiff's squadron that his relief from command was permanent and that the decision was his alone, contrary to the account of events Col Lee provided in his Article 138 denial.

59.     Among other pieces of recent evidence, Plaintiff presented numerous written statements from members of the 9th PSPTS to support various contentions in his application.

60.     In a section entitled "Basis for Correction," Plaintiff's application memorandum asserted seven arguments.

61.     The memo argued that Plaintiff's removal from command was arbitrary and capricious. The argument was supported, in part, by new supporting statements from witnesses.

62.     The memo argued that Plaintiff was improperly labeled a "toxic leader" without any clear standard for toxic leadership in the Air Force and without sufficient credible evidence that he engaged in any behavior that could legitimately be characterized as "toxic."

63.     The memo argued that the CDI failed to comply with Air Force standards, was fatally flawed and was wrongly used to justify permanent removal from command. This particular argument contained nine subparts.

64.     Subpart (A) argued that Col Lee had improperly inserted himself into the CDI process. The argument was supported, in part, by evidence that had not before been considered, including Lt Col Christen's statement.

65.     Subpart (B) provided new evidence that the chief complainant against Plaintiff had a personality conflict with Plaintiff and a history of undermining the command.

66.     Subpart (C) argued that the appointment of the IO was flawed because the IO was subordinate to Col Lee.

67.     Subpart (D) argued that the CDI was tainted, in part, because Col Ocker had "significant contact with the investigator and access to his report before it was even complete and should raise questions about whether Col Ocker inappropriately influenced the investigation."

68.     Subpart (E) asserted that Col Ocker and Col Lee had made inconsistent statements, telling Plaintiff that he was being "permanently" removed from command pending CDI investigation when, according to a new witness statement, Plaintiff's relief from command was always meant to be "temporary" while awaiting the results of the CDI and not withstanding Col Lee's personal involvement would have been reinstated following the conclusion.

69.     Subpart (F) asserted that the CDI was tainted by "confrontation issues" because the IO violated the CDI Guide by failing to interview Plaintiff and another key witness.

70.     Subpart (G) argued that the IO inappropriately used data from a Unit Climate Assessment (UCA) conducted less than 100 days into Plaintiff's command of the squadron and was over four months old by the time of the CDI.

71.     Subpart (H) argued that the CDI's evidence was weak that many of the new statements supported the conclusion that much of the CDI report was based on "unfounded opinions and half-truth grumblings of a few disgruntled members of the squadron."

72.     Subpart (I) asserted several "mitigating factors" supporting relief, including that the CDI itself found that Plaintiff "did not cause the squadron's problems, and that leadership issues existed at all levels within the squadron rather than just the front office."

73.     The memorandum next argued that the referral OPR violated Air Force Instruction and was otherwise erroneous or unjust.

74.     The memorandum asserted that the OPR violated regulation by failing to specifically detail the behavior or performance that caused the report.

75.     The memorandum asserted that the OPR violated the requirement that unsatisfactory behavior listed on the report must be based on information that is reliable and supported by substantial evidence and facts, not opinion or hearsay. The argument, in large part, was centered around the propriety of the CDI.

76.     The memorandum argued that required performance feedback was not accomplished, which violated Air Force regulation. In support of the argument, counsel cited a previous AFBCMR decision that counsel argued noted a lack of timeliness in performance feedback in its decision to void an OPR.

77.     The memorandum argued that the OPR failed to accurately reflect Plaintiff's superior duty performance in all areas, including leadership skills.

78.     The memorandum argued that the OPR was so starkly inconsistent with his performance ratings and awards before and after the eight-month rating period that its accuracy should discounted and should be removed from Plaintiff's records.

79.     The memorandum argued that Col Ocker, the OPR's rater, was unduly influenced by a primary complainant in the CDI who had a personality conflict with Plaintiff and improperly

influenced Col Ocker's evaluation. The argument was supported, in large part, by new witness statements.

**Advisory Opinions**

80.     After receiving Plaintiff's application, the AFBCMR sought two advisory opinions, one from Headquarters Air Force Personnel Center (AFPC)/DP2SP [hereinafter "DP2SP Advisory Opinion"] and another from AFPC/DP3SP [hereinafter "DP3SP Advisory Opinion"].

81.     The DP2SP Advisory Opinion, dated June 18, 2018, recommended denial, stating that "[s]ince the applicant never met the CY15B Colonel [selection board] there is no entitlement for him to meet an SSB."

82.     The DP2SP Advisory Opinion also argued that Plaintiff had not exhausted all administrative remedies because he did not file an appeal to the Evaluation Reports Appeals Board (ERAB).

83.     The DP3SP Advisory Opinion, dated March 11, 2019, recommended denial.

84.     The DP3SP Advisory Opinion explicitly stated, "we are unable to determine the legal sufficiency of the CDI, nor can we conclude that the applicant's removal from command was arbitrary and capricious." Thus, the opinion did not engage in any independent analysis of Plaintiff's arguments regarding the propriety of the CDI.

85.     The DP3SP Advisory Opinion asserted that the referral OPR contained sufficient specificity because it "states the applicant was relived [sic] of command and explains the reason he was relieved as a result of a substantiated CDI."  The opinion further asserted that Plaintiff "was given the opportunity to refut [sic] the comments and provided a rebuttal to the OPR."

86.     Regarding Plaintiff's argument that OPR's reference to unsatisfactory behavior was not based on reliable information and supported by substantial evidence, the DP3SP Advisory

Opinion stated that "we are unable to determine if [sic] the legal sufficiency of the CDI.

Therefore, we are unable to conclude that the referral comment was false or was based on

insufficient information." Notwithstanding this conclusion, the opinion continued to state that it

"appears" the rater adhered to regulation and "[m]oreover, the applicant has provided insufficient

documentation to prove that the CDI was flawed."

87.     Regarding Plaintiff's argument that he did not receive written feedback as required by

regulation, the DP3SP Advisory Opinion acknowledged the lack of feedback but stated that

"accoomplishing [sic] the performance feedback is a shared responsibility of both the rater and

ratee." The opinion continued to state that lack of counseling, by itself, is not a sufficient reason

to challenge an OPR and, according to DP3SP, Plaintiff "did not supply sufficient evidence to

show that the lack of feedback directly resulted in an unfair or inaccurate evaluation."

88.     The DP3SP Advisory Opinion conceded that the referral OPR did not reflect some of

Plaintiff's positive accomplishments but argued that "he has provided insufficient documentation

that the OPR was completed inaccurately."

89.     With respect to Plaintiff's request for a "reaccomplished" PRF that reflected a "Definitely

Promote" recommendation, the DP3SP Advisory Opinion asserted that Plaintiff had "not

provided documentation from neither [sic] his Senior Rater nor Management Level (MLR)

President supporting the promotion recommendation change. . . ."  The DP3SP Advisory

Opinion cited a regulation applicable to the Evaluation Reports Appeal Board (ERAB)—an

administrative board available to active duty airmen appealing OPRs—which states that the "the

Board will not approve nor consider requests to change an evaluator's rating or comments if the

evaluator does not support the change."

90.     The DP3SP Advisory Opinion did not address Plaintiff's arguments that the OPR was so starkly inconsistent with his performance ratings or that Col Ocker's assessment was unduly influenced by a primary complainant in the CDI who had a personality conflict with Plaintiff.

91.     The DP3SP Advisory Opinion did not address any of the previous AFBCMR decisions counsel cited in the AFBCMR memorandum.

92.     On or about March 12, 2019, the AFBCMR forwarded Plaintiff's counsel both advisory opinions for comment.

93.     By memorandum dated April 5, 2019, Plaintiff's counsel responded to the advisory opinions.

94.     The response argued that the DP2SP Advisory Opinion incorrectly stated that Plaintiff failed to exhaust his administrative remedies because Plaintiff was no longer on active duty and the ERAB therefore was not an available remedy.

95.     The response argued that the DP3SP Advisory Opinion was "fatally flawed" because it failed to provide any analysis of the evidence or the arguments presented in Plaintiff's AFBCMR memorandum. The response cited AFI 36-2603 para. 4.2.2.2 which requires advisory opinions to "address[] the crux of the case." The response asserted that the advisory opinion's reliance on Col Ocker's May 28, 2015 response to Plaintiff's UCMJ Article 138 complaint was "simply to rely on a faulty conclusion by the commander."

96.     The response argued that, by stating it was unable to conclude that the referral comment in the OPR was false or based on insufficient information and that it "appears" the rater followed regulation, the DP3SP Advisory Opinion did not refute Plaintiff's contentions.

97.     The response further argued that the DP3SP Advisory Opinion misunderstood Plaintiff's argument regarding the lack of feedback. Counsel asserted that the point of the argument was

that "[t]he absence of any feedback suggests that Col Ocker was not fully aware of the situation in [Plaintiff's] squadron and would be prone to overreacting when a couple of disgruntled people came to her in February 2015."

98.     The response next argued that, by making only a "standard response that applicant provided insufficient documentation that the 2015 OPR was completed inadequately," the DP3SP Advisory Opinion failed to address Plaintiff's claims that his 2015 OPR did not accurately reflect his superior duty performance. Relatedly, the response argued that the opinion did not address the claim that the referral OPR was totally inconsistent with his outstanding OPRs.

99.     The response argued that the DP3SP Advisory Opinion incorrectly relied upon an Air Force regulation that was applicable only to the ERAB and did not limit the authority of the AFBCMR.

**AFBCMR Decision**

100.     On or about May 30, 2019, the AFBCMR issued a final decision on Plaintiff's application, denying relief.

101.     The decision broadly described Plaintiff's requested relief and his contentions but did not independently or directly analyze Plaintiff's arguments.

102.     The totality of the AFBCMR's rationale is expressed in a single paragraph:

> After reviewing all Exhibits, the Board concludes the applicant is not the victim of an error or injustice. The Board concurs with the rationale and recommendation of AFPC/DP3SP and finds a preponderance of the evidence does not substantiate the applicant's contentions. The Board notes the 5 Apr 19 rebuttal letter contending the applicant presented substantial evidence of material errors and injustice, and that the AFPC/DP3SP advisory opinion failed to undermine the bases for the relief requested. However, the Board also notes, and agrees with the 25th AF/CC, and USAF/JAA, 27 Jul 15 and 16 Nov 15, determinations that the actions taken in this matter by the 9th Medical Group Commander, and the 9th Reconnaissance Wing

Commander were appropriate. Therefore, the Board recommends against correcting the applicant's records.

## CLAIM FOR RELIEF

### The AFBCMR's 2019 final decision is arbitrary, capricious, contrary to law, and unsupported by substantial evidence

103.    The preceding paragraphs are incorporated herein by reference.

104.    The AFBCMR must address all non-frivolous arguments placed before it. *See Poole v. Harvey*, 571 F. Supp. 2d 120, 126 (D.D.C. 2008).

105.     An AFBCMR decision violates the APA if it "entirely fail[s] to consider an important aspect of the problem." *See Gilbert v. Wilson*, 292 F. Supp. 3d 426, 434 (D.D.C. 2018).

106.    The AFBCMR cannot fail to respond to favorable evidence that could well have supported a different decision. *See Hill v. Geren*, 597 F. Supp. 2d 23, 26 (D.D.C. 2009).

107.    The AFBCMR's decision must be supported by "substantial evidence." *Hill*, 597 F. Supp. 2d at 29. "Evidence is not substantial if it is overwhelmed by other evidence, or if it constitutes mere conclusion." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1581 (10th Cir. 1994).

108.    The Board's action must be supported by reasoned decision making and if the Board's "explanation for its determination . . . lacks any coherence," the court "owe[s] no deference to [the Board's] purported expertise because we cannot discern it." *Haselwander v. McHugh*, 774 F.3d 990, 996 (D.C. Cir. 2014)(quoting *Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 437 F.3d 75, 77 (D.C. Cir. 2006)).

109.    The Board violates the APA if it renders a decision by adopting an advisory opinion that does not comply with the APA and the Board does not undertake an independent review untainted by the flawed advisory opinion. *See McDonough v. Stackley*, 245 F. Supp. 3d 1, 2 (D.D.C. 2017).

110.     The DP3SP Advisory Opinion that the AFBCMR adopted failed to consider non-frivolous arguments Plaintiff placed before it, failed to consider important aspects of the problem, failed to respond to favorable evidence and is not supported by reasoned decision making.

111.     The DP3SP Advisory Opinion, by its own terms, declined to address any matter related to the sufficiency of the CDI, about which Plaintiff's application made direct arguments and was a clear primary issue in Plaintiff's application.

112.     By making only a standard response that the Plaintiff did not provide sufficient documentation that the 2015 OPR was inadequately completed, the DP3SP Advisory Opinion failed to address Plaintiff's claims that his 2015 OPR did not accurately reflect his superior duty performance.

113.     DP3SP Advisory Opinion did not address the claim that the referral OPR was totally inconsistent with his outstanding OPRs.

114.     The DP3SP Advisory Opinion erroneously relied upon an inapplicable provision governing ERAB proceedings as a basis for recommending denial.

115.     By adopting the arbitrary and capricious DP3SP Advisory Opinion without undertaking any independent review whatsoever, the AFBCMR decision is itself arbitrary and capricious.

116.     By adopting the arbitrary and capricious DP3SP Advisory Opinion and merely "noting" Plaintiff's rebuttal without conducting any analysis on its own, the AFBCMR failed to address any of the rebuttal arguments Plaintiff asserted in in response to the DP3SP Advisory Opinion's analysis.

117.     By "noting" or adopting the bare, conclusory rationale of the 25th AF/CC and USAF/JAA UCMJ Article 138 denial letters without conducting any independent review of the

issues raised in Plaintiff's application, the AFBCMR engaged in arbitrary and capricious decision making because neither letter satisfies the AFBCMR's decision making obligations.

118.    Both the 25th AF/CC and USAF/JAA letters predate Plaintiff's AFBCMR application and do not address all non-frivolous arguments, fail to address newer evidence and otherwise are devoid of rationale sufficient to satisfy the AFBCMR's obligations under the APA to engage in reasoned decision making.

## REQUEST FOR RELIEF

Wherefore, Plaintiff respectfully requests that the Court grant the following relief:

(A)    Hold unlawful in their entirety and set aside the AFBCMR's 2019 final decision;

(B)    Enter judgment in favor of Plaintiff on all counts of this complaint;

(C)    Remand the matter to the AFBCMR for further actions in accordance with the Court's findings, decision, and order;

(D)    Upon proper application, award Plaintiff attorney fees under the Equal Access to Justice Act; and

(E)    Award such other relief as the Court deems appropriate.


Respectfully submitted,

*/s/Brian D. Schenk*

Brian D. Schenk
(MN #0391577)
Midwest Military & Veterans Law, PLLC
310 4th Ave. S, Ste 5010
Minneapolis, MN 55415
Ph: (202) 557-6570
Fax: (612) 206-3170
Email: brian@militaryandveteranslaw.com

Dated: September 18, 2020